May it please the Court, I'm Julie Hall with Kevin Lurch for the petitioner Joseph Wood. I'd like to reserve five minutes of my time for rebuttal. If we were to create the perfect formula for a death sentence, it would require two things, a prosecutor with a win-at-all-costs attitude and a disdain for the rules and the law, and a defense attorney unable or unwilling to muster an adequate defense for his client. In Pima County in the 1980s and 1990s, the ingredients in that mix were Thomas Iwata and Lamar Couser, and they came together in the trial of Joseph Wood. This capital trial in its entirety, including jury selection, openings and closings, deliberations and verdicts, lasted only five days, the evidence itself three. In one respect, there was a good reason for that. There was only one legal matter in dispute in the entire case, and that was whether Mr. Wood premeditated the murders and, as a result, whether they were potentially death-eligible first-degree murders. But the brief time for the presentation of the evidence, in fact, the State's case itself was only two days, meant that the prosecutor's misconduct, although not long in terms of time, had an extremely devastating impact on the defense. Our briefs provide numerous examples of the prosecutor's misconduct, which occurred throughout the trial and, of course, must be considered cumulatively, but I'd like to focus on two of them, which arose during the prosecutor's cross-examination of the defense expert, Dr. Allender. First, the prosecutor questioned Dr. Allender regarding the failure of the defense to use hypnosis or truth serum to attempt to recover Mr. Wood's memory of the events surrounding the crime. He put it to the jury that this evidence was a reliable and admissible way to determine  Again, the only question he could draw. He didn't use those words precisely, though. I think it's the only conclusion the jurors could draw, Your Honor, when you combine it with the defense's failure to object and the trial court's failure to give any instruction. Does it make any difference in this case that there was an underlying opinion by, I think, Dr. Morris that used those terms? No, Your Honor. You know, the Arizona Supreme Court's opinion said, well, there was this other doctor who said, we're going to, you know, maybe you want to give this other testing. And so the Arizona Supreme Court said it was a legitimate question to probe this expert's opinion. But to ask an expert, well, gee, why didn't your opinion include something that's scientifically unreliable and absolutely inadmissible in any court just isn't a legitimate way to question that expert. Well, it's questionable. But the doctor then responded, well, I don't agree with Dr. Morris on the reliability of such techniques. He gave a brief answer in that regard. But, again, with no objection that the question and that the subject matter was not to consider it, they're left with the only inference they can really draw, which is Mr. Wood could have been administered truth serum. He could have been put under hypnosis. And if those things had happened, we would have been given an answer to what his state of mind was at the time of the crime. And left with that, the jurors would conclude, because he didn't do those things, he has something to hide. And there's also the other aspect, of course, of that, of the prosecutor using it as a comment on Mr. Wood's failure to testify at the trial, which, of course, is improper in its own right. I'm sorry. Is there another reference other than his cross-examination of Dr. Allender in which the prosecutor suggested that this failure to do so was, should call attention to Wood's failure to testify at the trial? Or is this the incident? That's one incident related to the truth serum and the hypnosis. Although, in closing argument, the prosecutor does tell the jury regarding Mr. Wood, he knows what he has to say, which is he's discussing Mr. Wood's lack of memory. Okay. But there isn't anything else in which he's referred to the hypnosis or the truth serum in which the prosecutor has drawn a connection between the failure to test on that and Wood's failure to testify. He doesn't. Generally, in closing, he argues, the prosecutor argues that the doctor was unprepared, that he didn't have enough background information. He doesn't specifically refer to the hypnosis or the truth serum again. But the Arizona courts and the federal courts have emphasized when you put a reference to scientific evidence like that in front of a jury, they put great weight on it. And, again, it's coming in the context of a ---- But what's your, I mean, Judge Thomas referred to the doctor's answer. The question was, did you attempt, did you request a hypnosis evaluation? I didn't because I didn't. I'm not as convinced about those techniques as Dr. Morris is. I mean, why isn't the inference that the doctor has says, I don't agree with Dr. ---- Whatever Dr. Morris thought about these, I don't agree, and that's why I wouldn't have done it. I think, Your Honor, because he doesn't explain, he says I doesn't agree. He doesn't actually explain why they're scientifically unreliable. And, more importantly, he doesn't explain ---- But that could have been probed by counsel if he thought he wanted to call attention to this once again. Right. And there's no question that counsel's, defense counsel's ineffectiveness is a major factor in why this ---- You think that he should have called attention to this one more time? That he should have asked that the jury be instructed, because what the jury never hears is that those techniques are completely inadmissible by either side. Okay. But, I'm sorry, I now want to go to the ineffective assistance of counsel. You think that counsel should have raised this again in the trial? Not to raise it again, Your Honor, but to object. Object when the questions were asked so that the jury could be instructed those methods are nonscientific and not admissible, and they can't consider whether they're given or not given. They can't consider that as ---- Might that have called more attention to the incident than it was worth? I think, given the weight ---- If you yell, pay no attention to the man behind the curtain, we can't help but notice the Wizard of Oz back there, can we? Well, there's different ways to object, I guess, Your Honor. And to just simply object to an improper question and ask that the jury be instructed to disregard it doesn't call that much more attention than the reference to scientific evidence calls itself. I mean, truth serum, it's almost like a, you know, some courts have referred to it as almost kind of a mystical, magical, you know, you could give them this truth serum or put them under hypnosis and you'd have the answer that you're looking for. A simple objection and an instruction from the court really wouldn't have given the jurors any more ---- it certainly wouldn't have led them to lend more credence to the lack of those tests. Do you have any case that would suggest that the failure to object here is ineffective assistance of counsel? And any evidence that this could not have been a strategic decision by counsel not to call any more attention to this? Counsel's ---- I don't know of a specific case of ineffective assistance related to truth serum and hypnosis. Because they're inadmissible, I think they just typically don't come up in trials and so there's not an occasion to object to a reference to them. But ---- oh, and now I'm blanking out on the second part of your question. Yeah, I'm just wondering whether there's any chance that this was a strategic decision by counsel not to call more attention to this incident than it deserved. No, because we do have in the record the deposition of trial counsel, who when he's asked about these various failures to object, he never gives much more of an answer other than, gee, I'm not really sure, I may have thought I didn't want to call more attention to it, I don't know, I don't remember. How many years later was the deposition from the trial? If the trial was in 1990, the deposition was about 1996 roughly. So six years later. About six years, right. Well, it's a tough decision to make. I mean, if you're sitting at a counsel table and something comes up like that, you do have to make a quick choice as to whether or not to let it go and not call attention to it if you think it's damaging, or to object and put it all over the record. And, you know, people differ on what tactic they think they ought to employ. Although in this case it couldn't have come as a surprise to trial counsel because the prosecutor had already been reversed on direct appeal in a case for misconduct, for attacking mental health evidence in improper ways. So, and trial counsel. I'm not sure that he anticipated that the precise question would have been asked. But he did have, obviously it's impossible to anticipate every single question, but he did have the report of Dr. Morris that referred to the true serum and the hypnosis, and that should have been a red flag to him, particularly with this particular prosecutor, to say, I'm going to make sure that that is not coming in during this trial. Well, they had a very, very long session at the beginning of the trial of motions in limine, and he did anticipate a lot of the things that the prosecutor was going to try to do. Maybe this doesn't jump out at him, but he certainly did anticipate that some of the tactics that were going to be employed, and they vetted those things. I'm not sure that the objection would have been sustained. I mean, I think in a sense it's foundational. Did you give the test? No. And maybe the trial judge should have said that you have to know it's not admissible. But if it's in the report, it's more fair game than if it's out of left field. Although at a minimum the jury would have been instructed that had those tests been given, they wouldn't have been admissible. So at a minimum there would have been an instruction on that, and I think that accomplishes the same thing. It tells the jury you can't give any weight to whether or not this test was given, and you certainly can't speculate about what the result of those tests would have been had they been given. Just one more question before you leave, because I think it's an important part of your appeal. It's a little bit different in this case than other cases, because in this case the question is not whether somebody did it or didn't do it. The question is state of mind. Does that make any difference here? It makes the difference in that each time the prosecutor's misconduct hit on that issue, it struck right at the nerve of the case. So had there been ñ had the defense been alibi or self-defense or something else, you know, these questions would have had, you know, involved much less prejudice to the defense. But because of that being the only central critical issue in the case, those questions were very important and very prejudicial. And as was the second instance that I'd like to discuss, the prosecutor's questioning of Dr. Allender regarding Mr. Wood's mental state at the time of the crimes. This is an issue, of course, that the prosecutor had successfully moved in limine before the trial began, and the court had properly prohibited any questions on that issue. But the prosecutor went for the jugular of the defense again when he questioned Dr. Allender about that mental state. So Dr. Allender ñ and again, this is where the ineffective assistance of counsel plays into the prosecutorial misconduct question. Dr. Allender was attacked by the prosecutor not only for being completely unprepared in terms of not having interviewed witnesses, not having been to the scene of the crime, not having looked at all the police reports, but he was also, through no fault of his own, unprepared to respond to those questions because he knew that they were inappropriate and he couldn't answer them. So the ñ again, in closing argument, the prosecutor used that to argue that Dr. Allender ñ there was no way he could tell the jury what the mental state was at the time of the crime. But because there was no defense objection and because there was no court instruction otherwise, the jury had no way of knowing that Dr. Allender was not permitted to give an opinion on mental state at the time of the crime. Wasn't there a specific question on that? If I'm ñ am I recalling that incorrectly? A specific ñ I think ñ didn't on cross-examination the prosecutor come close to saying you really can't opine at the state of mind at the time because you weren't there, something to that effect? That's right. I'm not going to remember the exact language of the question, but it was essentially, you know, how would a ñ how would a non-impulsive person have committed this crime versus the way it was actually committed, essentially? And so the thrust of the question was how can you possibly say that Mr. Wood ñ you know, Mr. Wood wasn't acting impulsively at the time of the crime? And, of course, that's the precise subject matter, that the expert is not permitted under Arizona law to testify about. And one more issue about the prejudice in the case, it was exacerbated by the trial court's giving of a premeditation instruction that actually improperly defined premeditation. It's ñ the Arizona Supreme Court at the time ñ state courts in Arizona were giving instructions on premeditation that focused on the passage of time, and essentially that the passage of time after the formation of intent was enough for jurors to find premeditation. The Arizona Supreme Court has since rejected that instruction and ordered that it not be given anymore, but it was given in this case. In fact, the language was something like, the intent exists long enough to permit reflection. We know that the jurors heard the answering machine tape, from which the state could certainly argue that intent was formed. And then we know there's a passage of time, and then the crimes happen. Given that, with the premeditation instruction that tells them all you need is the passage of time, it just magnifies these errors. You have a whole confluence of errors between instructions, lack of objections, and the prosecutor's improper questions. Counsel, Judge Gould, if I may interject a question, please. I don't quite understand. What is the federal constitutional issue raised by the state instruction to the jury on premeditation? It's still ñ it's not a separate claim, Your Honor, the jury instruction. It wasn't raised as a separate claim in these proceedings, but it's a factor in the prejudice. Had there been a proper premeditation instruction, the prejudice would not have been so great, although it still would have existed. So the federal constitutional basis is still cases like Young and Donnelly and Berger v. Kemp, the prosecutorial misconduct cases, and so it's based on Mr. Wood's due process right to a fair trial. And those cases say, of course, that you have to look at the misconduct in the context of the entire trial. And so we're back again to these questions. In fact, this witness, essentially, there were a few lay witnesses that also supported impulsivity, but this expert witness really was the entire defense in this case on the one issue that mattered. And so these improper attacks on that testimony and then the prosecutor's argument in closing, essentially shredding this expert, were prejudicial and denied Mr. Wood his right to a fair trial. I'd like to turn also to trial and sentencing counsel's ineffectiveness, which we've touched on a bit, at least at the trial stage. And, again, this is an issue that has to be considered cumulatively, all of trial counsel's errors. At nearly every turn in the proceedings, defense counsel's errors, we have a bifurcated proceeding. Is that so? I'm sorry? We have a bifurcated proceeding. We have the trial and we have the sentencing. Why do we need to consider ineffective assistance at the guilt phase in assessing ineffective assistance at the sentencing phase? The trial judge, who was a sentencer at the time in Arizona, of course, is permitted to and does rely on all of the evidence presented throughout the trial in determining the sentence. And so Mr. Kauser's failure to properly prepare the first expert, Dr. Allender, in his testimony weakened the defense case at sentencing as well. Although independently, Mr. Kauser was ineffective at sentencing because of his failure to properly investigate and present a case for life. The district court's finding that counsel was minimally competent is not supported by the record, that counsel did some minimum actions is not the equivalent to a minimal performance. So although we, under Strickland and the Strickland cases, we define it as a minimally competent performance, in a capital case that's still a fairly high standard. It's a standard that requires, and we know all of the requirements in the ABA guidelines that we use as a guide to tell us how we have to perform in these cases, that's our minimal standard, not what the district court applied, which was essentially, well, Mr. Kauser put up an expert on the stand. Mr. Kauser gathered some records and gave them to the expert. He filed a sentencing memorandum. The district court's assessment of Mr. Kauser's performance was essentially a quantitative one. He did X, Y, and Z. But what Strickland requires, and particularly in a capital case, is that you do X, Y, and Z to a certain standard, which he didn't do. What do you think the pivotal information was that wasn't presented? It's primarily the evidence of what would have proved Mr. Wood's organic brain damage. There's also his military service, which I don't want to minimize. Right, but the judge was aware of the military service. That was all over the trial. Although the judge didn't list it as a mitigating factor, it was raised by the defendant's father. It was subject to pretrial motions because the Las Vegas episode was related to that. So it was mentioned in opening argument. I mean, the judge knew about the military service. He did. What he didn't know, Your Honor, was what were in the actual military records themselves, which were given to him probably no more than two hours before the sentencing began in the case, and that is what showed this degeneration in Mr. Wood's mental functioning over the course of the four or five years before the crime. And those records showed, in combination with the testimony his family could have given and what his school records would have shown had they been offered, they showed that Mr. Wood, in spite of a family history of mental illness and extreme violence and substance abuse, which would have made him vulnerable to mental illness and substance abuse himself, he actually maintained a fairly stable mental health throughout his young part of his life until sometime after he was in the military. But the records would have put the head injuries in context because the one critical error in the case was that the experts would have said, well, he has these head injuries, but we can't see that they had any effect. And, in fact, they couldn't see they had any effect because they didn't have those records from the military records that showed the job performance. His parents weren't asked about the extreme change in his behavior between the time he was about 18, throughout his 20s, essentially, is when this change in behavior occurred. And so counsel didn't present a complete picture of who his client was and, more importantly, why his client was, how he got to where he was. And so it left the court with this picture of, essentially, he's sort of a guy who just chose to be bad or a guy who was impulsive and didn't bother controlling it. And what the full picture would have shown was that there was really serious injury to his brain that actually changed his behavior. And that is infinitely more mitigating than this view that, well, he chose to drink a lot and he got mad when he was drinking. And so that additional investigation, those additional records, would have better prepared the experts and presented the complete picture that's required in these cases. And just another word on prejudice, and I know it's in the briefs, but the post-conviction counsel and habeas counsel below requested evidentiary hearings, requested investigation and mental health experts, neuropsychological testing, neurological testing, and was all denied. So the extent that the prejudice isn't extant in the record, it's through no fault of the petitioner, and it only requires that the case be remanded for an evidentiary hearing so that that prejudice can be developed. And it's not a matter of some other attorney could have done better in this case. It's a matter of nearly any other attorney would have done a better job and it would have mattered. Nearly any other attorney would have provided sufficient materials to his expert to get an accurate picture of his client, had his expert conduct neuropsychological testing. In this case, there was a neuropsychologist appointed at trial, but inexplicably he didn't do neuropsychological testing. He did IQ and personality and memory testing, and that was it. But, you know, we do see a lot of capital cases out of Arizona, particularly out of that era, and I will say that there are a lot of cases in which the defense counsel did absolutely nothing. I'm thinking of Correll, I'm thinking of Summerlin, others where there was no defense at all. Here, at least, I realize that looking back through the lens, one can say it may not have conformed to the standard, but it certainly was much better than I've seen in a lot of cases. It was a shadow of a defense, Your Honor. He sort of went through the motions. You know, again, I guess I've got to put an expert up there, but I think the entire transcript of the mitigation case was 18 pages. He presented one witness, and then he told the court in his closing argument that Mr. Wood had, I think his words were, summarily executed the victims, and told the court that he would have shot Mr. Wood himself if he'd been there. There are certainly other ways to convey to a court, better ways to convey to a court that your client accepts responsibility for the crime, and that is another part of the ineffective assistance. That sentencing claim that I think is very important is that he essentially abandons his client, at most tells his client there's going to be a pre-sentence interview, but doesn't give him any instruction, doesn't attend the interview, and his client makes very damaging statements to the pre-sentence officer that the trial court doesn't find, but the trial court doesn't find remorse as a mitigating factor as a result of those statements, which we know is one of the most important mitigating factors we can have in a capital case. So all of these errors together combine to establish that counsel was ineffective at the sentencing phase, and the fact that he did a smidgen more than nothing isn't where we set the bar for effective assistance in a capital case. He did do a smidgen more, but he didn't present a case for life on behalf of his client, not the case that he could have presented. At its root, Strickland is about confidence. Can a reviewing court have any confidence in the outcome achieved in the trial court? In this case, the actions of the prosecutor and the defense counsel combine to undermine any reasonable amount of confidence in the jury's verdict and the trial court sentence. I'd like to reserve the remainder of my time, if I may. Any further questions before she sits down? Thank you, counsel. Thank you. May it please the Court, counsel. Mr. Wood's conviction and sentence were not the result of prosecutorial misconduct or ineffective assistance of counsel. This was a case that demonstrated clear evidence of premeditation. There were multiple eyewitnesses to the crime. The defendant left messages on the victim's answering machine. The Friday before the Monday murder, making clear that he was threatening her, he went into the victim's auto shop and looked for Deborah's father, killed him. He struggled with someone else, the victim's brother, but was not so impulsive as to shoot the person he was struggling with, and then went to look for his former girlfriend, Deborah, and found her and shot her. The evidence of premeditation was overwhelming. The allegation that has been made that this was a close case is simply not true. With regard to the sentencing posture of the case, Mr. Wood was evaluated by five experts as of the time of sentencing, and there's been an additional expert who examined him as part of the habeas proceedings. Even today, the only diagnosis we have is that he's impulsive, antisocial, narcissistic, and has alcohol and drug problems. There's simply no compelling mental health evidence that's been marshaled over the last two decades. With regard to that, I would like to clarify the State's position on the standard review before addressing specifically the prosecutorial misconduct and ineffective assistance claims. This case is subject to EBPA deference. There's a question on prosecutorial misconduct and ineffective assistance. The District Court noted that it was engaging in a de novo review on aspects of those claims. With regard to prosecutorial misconduct, the State Supreme Court specifically addressed the issues of misconduct that were raised in the context of prosecutorial misconduct, the testimony that related to misconduct. The Arizona Supreme Court specifically addressed the other issues as they were raised as evidentiary issues, whether the admission of bad character evidence resulted in an unfair trial. And certainly those rulings are entitled to EBPA deference, and they resolve the issue of prosecutorial misconduct. If it was not improper to – if the evidence was properly admitted, there was no prosecutorial misconduct in admitting the evidence. With regard to ineffective assistance of counsel, the – Mr. Wood raised four IAC claims on direct appeal that were not specifically addressed by the Arizona Supreme Court. They specifically told – in the opinion, the opinion states that the better practice is to raise these in an – in effect, in a post-conviction proceeding and decline to address the merits of the claim. And this was before the post-conviction proceeding. In the post-conviction proceeding, those issues were not raised. It's our view that those are procedurally defaulted. But in any event, those only relate to trial, ineffective assistance of trial counsel. All of the sentencing claims were addressed on the merits by the State courts. Do you mind talking for a minute? I don't want to interrupt the flow of your argument. But one of the critical aspects of the case that sort of jumps out is the cross-examination, raising the truth serum in hypnosis. There really doesn't seem to be a good reason other than to try to get that information in front of a jury for the prosecutor to have asked the question. It's a tough issue for you, I think. Well, I think it is a tough issue to a certain extent. But it was part of the evidence that Dr. Allender relied on. But, for example, if he said, yeah, I think you should take a polygraph, that would have been a mistrial, immediate mistrial, if he had tried to elicit that information. What's different from saying – asking about a truth serum in hypnosis as opposed to the polygraph? Well, I think it's important to keep in mind that what the questioning was going to was his inability to remember anything at all. And it wasn't a question as to his version of whether he premeditated or not. This was simply whether he had any memory or not. So it wasn't calling into question his specific state of mind at the time of the crime. It was calling attention to whether he remembered. And Mr. Wood's counsel has suggested that there was a violation of Mr. Wood's right to remain silent. And that's simply not the case because Mr. Wood did not remain silent. He spoke to his – he spoke to the mental health experts and gave him and provided an explanation, talked about what he was thinking before, and he gave an explanation that's essentially a mental health defense of I don't remember anything. So there's no silence. And so there cannot be a violation of the defendant's right to remain silent. And there was no – the prosecutor did not suggest that he should have taken a lie detector test. This was at least one step removed. And it was just going to whether – the truthfulness of whether Mr. Wood could remember what had happened. And, again, even assuming some type of error, I think it's clearly harmless. There's simply not a good case of impulsivity. The facts do not support a claim of impulsivity. And that's all this issue would go to. With regard to the question that was asked to the expert, Mr. Wood had placed his mental health at issue. And I think his claim was that this was an impulsive act. And the prosecutor was simply asking what elements of the offense suggests that this is impulsive or premeditated. And in asking the question, this is generally a question that is helpful to the defense. The general rule is that the defendant can put on an expert who can describe the defendant's impulsive characteristics or his character trait of impulsivity, but cannot offer an opinion as to his precise state of mind at the time of the crime. So to the extent the questions are going to that, that's actually helping the defendant, assuming, as I think we can, that Dr. Allender's view was that this was an impulsive crime. So I don't think there's any prejudice to the defendant whatsoever with regard to the line of questioning that was asked. And I think it is important to note, as we've submitted supplemental authority, noting that when a defendant puts his mental state at issue, it does open the door to all kinds of evidence regarding the defendant's past, including his mental history. So as to the other evidence, I think there's no question that that evidence was admissible. With regard to ineffective assistance at sentencing. The reference to the criminal history was not admissible. And he asked about that. Well, I think when you put your mental health at issue, it does, the ordinary rule is that it does become relevant. When you have a motion on limine granted that precludes you from asking about it and you ask about it, that's improper. You'd have to concede that. Well, again, because it was part of the information that was reviewed by the experts, it's hard to separate that out. And here they didn't go into the details of the ‑‑ Well, that's true. It was a passing reference. But I think the point is, in some of this examination, that the prosecutor appears to be trying to get in inadmissible evidence under the guise of testing the theory on impulsivity. Just because you're asserting a mental defense doesn't mean that all the rest of the rules of evidence get discarded. Well, I think the only, from my perspective, the only close call is the reference to truth serum or hypnosis. I think when you're raising a defense that I act impulsively, it's fair game to question all kinds of other incidences in your life in which you engaged in violent behavior to assess, does he only act this way, is it impulsive, or does he actually think things through? And so I think you do open the door. And, again, this was simply a passing reference. Well, that may be enough to render it harmless. But the prosecutor at the beginning of the trial said, I'm not going to talk about that. And the defense counsel said, I'm making a motion to eliminate a preclusion from talking about it. And the judge said, you're not going to talk about it. And then it pops right up in cross-examination. Now, there wasn't an objection, of course, and it was a fleeting reference. But the theme seems to be, it looks to me as though the prosecutor is trying to get in inadmissible evidence through cross-examination under the guise of testing the theory. Well, I would just disagree that it's the theme. I think if you go through the entire trial, the transcripts, those are very, that was a very, it's a passing reference to that. It doesn't go into great detail. And the theme really is he's put his mental health at issue. And when you look at the deposition that was conducted by trial counsel five or six years after the trial, he made clear that this was a strategic reason that he didn't object. And he made clear that he thought this type of evidence was admissible because it was consistent. It was consistent with the type of defense that was being presented. And Mr. Couser called witnesses to talk about other incidences. He called other witnesses, including Mr. Wood's parents, to discuss other incidences where Mr. Wood had engaged in violent behavior or had acted out impulsively. And so Mr. Couser recognized that it would be futile to be objecting to this type of evidence coming in. So I disagree that the trial was characterized or that there was pervasive misconduct throughout. There were very limited, a passing reference to the criminal conviction and this reference to truth serum and hypnosis. And other than that, I didn't see anything that from my perspective suggests any type of prosecutorial misconduct and certainly nothing to the level that would warrant relief in this setting. With regard to ineffective assistance of counsel, as I pointed out, even today, almost two decades later, all we have is experts who say that the best defense would have been impulsivity, the defense that was in fact presented. The expert just says, oh, it could have been presented better. But presenting impulsivity better would not have changed the outcome of this case because the crime simply was not an impulsive act. And it's important to note when we talk about something, for example, like military records, we're here now to assess the propriety of the post-conviction court's denial of the ineffective assistance claim. Certainly that court had the military records. The trial court was aware of it, even if it only had specific documents a few hours before sentencing. This was something that Mr. Couser raised in his opening statement. It was evidence that came out at trial. He didn't argue it in his mitigation speech, though. He didn't argue it specifically, no. But he did – he – this was a case where a number of witnesses were presented. It's important to remember, as well, in assessing his performance at sentencing, that the evidence that was presented at trial was evidence that related to sentencing because the defense was impulsivity. Right. I take your point on that. In the military experience that came in at trial, all I'm saying is that he didn't urge it as a mitigating factor specifically when he addressed the judge. I mean, it's – and I realize at that time under judge sentencing that a lot of these capital sentencings took the form of a normal case sentencing rather than a separate proceeding. But it's a pretty short presentation. It's, you know, a very, very truncated presentation. It is, again, but if you factor in the testimony, counsel did present a number of witnesses during the guilt phase that would have been typically presented during sentencing that go to this mental state of impulsivity, including his parents, former girlfriends, and other people who knew him. With regard to ineffective assistance for not requesting testing, neurometric testing, he did, in fact, Mr. Couser requested the testing prior to sentencing. But by that point, Dr. Allender had testified at trial that there was really no evidence of organic brain damage. Dr. Boyer had also examined him and suggested that to the extent there were any changes in lability after motor – post-motorcycle accidents, that those changes were probably the result of alcohol use rather than a head injury. So the trial court was well within its discretion to deny the request for neurometric testing prior to sentencing. And there's no – there's – neurometric testing is not considered something that's dispositive of any particular issue. The United States Supreme Court has characterized that type of evidence as weak, if we look at the Landrigan decision. Certainly, the amount of evidence that was presented, the defense that even today, after six mental health – six mental health experts have examined Mr. Wood, the best that he can present is that he's antisocial, narcissistic, and impulsive. And that's simply – given the fact that there were two murders that the State Supreme Court and everyone acknowledges is an extremely weighty, aggravating circumstance, this was simply a difficult case for any attorney to have obtained anything other than death sentences. So I disagree very strongly that there was pervasive misconduct or pervasive ineffective assistance. I think it was a result of a violent crime where there were two murders that was – there simply was not a good defense. And if there are no further questions, that's all I have. Judge Gould? I have no questions. Thank you. Thank you, counsel. The State argues that this wasn't a close case. And it was – there were two murders. There was a lot that wasn't close in this case, as this Court recognizes. Mr. Wood was guilty of two second-degree murders, and the defense conceded that. What was close was actual reflection – actual reflection required to find premeditation. The State talks about multiple eyewitnesses, the messages on the answering machine tape, going into the shop, shooting Mr. Dietz, shooting Ms. Dietz. And those all show intent. And what the jury had to grapple with – should have had to grapple with – was whether, with his decompensating, damaged brain, Mr. Wood ever actually reflected on those actions. And to think that an adequate presentation of the impulsivity defense would have raised a reasonable doubt about that question for one juror is what makes a difference in this case. And I think that's perfectly reasonable based on what the record in this case shows. There was not an additional expert that examined Mr. Wood in habeas. Below, the district court allowed a few hours for the habeas counsel to consult with a neuropsychologist. His declaration is in our excerpt, and it says, Additional testing is absolutely required, and a thorough neurological workup and neuropsychological examination is needed in this case. And even based on the record, this expert, Dr. Walter, said he was reasonably certain that he would find brain damage, and that makes a huge difference. The State emphasizes that almost two decades later, they say, We're not giving you enough. Well, we've been for two decades asking for the resources to do the investigation, to get the experts, to show you what that prejudice would be and what the defense case could have been, and we've been denied it by the State court and by the district court below. What impact do you think Landrigan has on your analysis? Only Landrigan, first of all, Landrigan EDPA applied, which it does not in this case. We don't have a 2254D problem. We don't have a 2254E2 problem. So that's an enormous difference. But, of course, in Landrigan, the defendant waived his mitigation, waived his presentation of mitigation, and that was absolutely not true in this case. There's no indication in the record at all that Mr. Wood was anything less than completely cooperative with his lawyer, and so I really don't think Landrigan is particularly relevant. And the Arizona Supreme Court, the bottom line is that the Arizona Supreme Court did not address the IAC issues, and it was at a time, kind of a quirky time in Arizona law, where it wasn't clear to a lot of defense practitioners whether they should be raising those issues on direct appeal. It wasn't until later, or in postconviction, it wasn't until later when there was a firm rule on that issue. And so the district court's finding was right on in this case that those issues were properly raised in the direct appeal, and the Arizona Supreme Court declined to rule on them. And so they are not procedurally defaulted, and this court should consider them on the merits, as I said, without applying 2254D2. I think that's all I have. If the Court... Any further questions? I have no questions. Well, thank you both for your arguments this morning, and we realize you've extensively briefed them. To the extent you haven't argued them specifically,  and we appreciate the opportunity to hear from you. I appreciate your succinct presentations of your position. I think you both did an excellent job in briefing and in arguing the case. I want to thank you both. We'll take a short recess, and then we will return to conclude our sessions. Thank you.
judges: Thomas, Gould, Bybee